UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JOHN ROSELLO,

                 Plaintiff,

         -against-

THE LONG ISLAND RAIL ROAD
COMPANY,

               Defendant.
--------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
11-CV-5447 (ADS)(SIL)

**APPEARANCES:**

**Law Office of Philip P. Vogt, PLLC**
*Attorneys for the Plaintiff*
5 Penn Plaza, 23rd Floor
New York, NY 10001
    By:   Philip Patrick Vogt, Esq., of Counsel

**Krez & Flores, LLP**
*Attorneys for the Defendant*
225 Broadway, Suite 705
New York, NY 10007
    By:   William J. Blumenschein, Esq., of Counsel

**SPATT, District Judge.**

On November 7, 2011, the Plaintiff John Rosello (the "Plaintiff") commenced this action

against the Defendant The Long Island Rail Road Company (the "Defendant") pursuant to the

Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 ("FELA"). The Plaintiff alleged that on

January 12, 2011, while working at the Defendant's headquarters located in Garden City, New

York, he suffered injuries as a result of the negligence of the Defendant, its agents, servants

and/or employees. A trial was held and on September 17, 2013, the jury returned a verdict in

favor of the Plaintiff and awarded the Plaintiff damages as follows: (1) $450,000 for pain and

suffering and emotional distress; (2) $86,238 for loss of earnings; (3) 207,826.17 for medical expenses; (4) $700,000 for future pain and suffering, emotional distress and permanent injuries; and (5) $500,000 for future loss of earnings.

Presently before the Court is a post-trial motion filed by the Defendant under Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 50(b) and 59. The Defendant seeks a new trial on the issue of the damage award for past and future pain and suffering or, in the alternative, for remittitur of those awards. For the reasons that follow, the Defendant's motion is denied.

## I. BACKGROUND

The Plaintiff was born on September 28, 1963. He was employed as a heavy equipment operator with the Defendant. According to the Defendant, the Plaintiff suffered a long-standing, pre-existing condition in his neck involving stenosis and spondylosis.

On January 12, 2011, while working for the Defendant, the Plaintiff was directed to operate a Case 590 Super M+ Loader/Backhoe to plow snow from the Garden City Headquarters' parking lot. The proof revealed that a loader/backhoe is not a proper machine to use to plow snow as it has a fixed/rigid bucket which does not give if it strikes an obstruction in the roadway. In the course of plowing, the loader bucket struck the ring of a manhole which was raised above the level of the surrounding parking lot surface causing the loader/backhoe to come to a sudden and complete stop which, in turn, resulted in the Plaintiff striking his forehead on the windshield frame and injuring his head and neck.

Immediately after the subject accident occurred, the Plaintiff experienced severe neck pain traveling to his shoulders and arms. His legs were also wobbly and he required assistance to walk.

2

The Plaintiff went to the Emergency Room at Winthrop Hospital, where he was admitted about 7:00 a.m. and remained until approximately 10:00 p.m., at which point he was discharged. Upon his discharge, he was prescribed Percocet to treat his pain.

Dr. Michael A. Lefkowitz, a neurosurgeon and the Plaintiff's treating physician, examined the Plaintiff during his January 12, 2011 emergency room visit. Based on this examination, it was Dr. Lefokowitz's initial opinion that the Plaintiff was suffering from a central spinal cord syndrome injury or, in other words, an incomplete spinal cord injury involving weakness or sensory changes in the upper extremities, especially with respect to the use of one's hands and walking. As such, Dr. Lefkowitz recommended that the Plaintiff undergo a cervical decompression and stabilization procedure.

On January 13, 2011, the Plaintiff was examined by the Defendant's Medical Department and advised the Defendant's medical personnel that he was suffering from pain, which started at the bottom of his head and top of his neck and spread downward to the middle of his back and shoulder blades. Thereafter, the Plaintiff continued to experience this pain in his back and neck, as well as headaches and discomfort in his left arm.

The recommended cervical decompression and stabilization procedure was ultimately performed by Dr. Lefkowitz on March 30, 2011. During the procedure, incisions were made in the front of the Plaintiff's neck and discs located between two vertebral bodies were removed, as was the ligament connecting the bones behind the disc space. Bone implants were then inserted into the spaces and a metal plate was attached with metal screws to the front of the spine.

Following surgery, the Plaintiff reported suffering pain as a result of his operation, which was in his back and neck and in the back of his head. He was unable to perform any household

tasks, and spent most of his time sitting at home. He slept in a recliner, because his pain prevented him from sleeping in his bed for more than a couple of hours at a time.

However, by September of 2011, the Plaintiff stated he was feeling okay, although he was still experiencing pain and weakness in his left arm on some days. The Plaintiff also returned to work about this time.

Dr. Lefkowitz also testified that by September of 2011, which was nine months after the Plaintiff's January 12, 2011 accident, the Plaintiff had no significant complaints and was continuing with physical therapy. Dr. Lefkowitz stated that the Plaintiff's neck was non-tender, that the Plaintiff had a full range of motion with normal strength and sensation; and that the Plaintiff's reflexes were normal with regard to his neck and walking. At the time, Dr. Lefkowitz recommended that the Plaintiff return to work at his full duties without limitation.

In October of 2011, the Plaintiff left his employment with the Defendant. He complained of pain that was similar to the pain the Plaintiff experienced after the January 12, 2011 incident, in that he had pain from the middle of his neck through the back of his neck and out to his shoulder blades, in addition to weakness and numbness in his left arm. According to the Plaintiff, returning to work to operate the Defendant's equipment aggravated his condition.

On December 29, 2011, the Plaintiff reported to Dr. Lefkowitz that he could no longer work due to the neck pain and headaches he was experiencing, which worsened with activity. Dr. Lefkowitz examined the Plaintiff and found that the Plaintiff had a decreased range of motion of his neck. He further found that a December 27, 2011 CT scan of the Plaintiff showed that there had been incomplete fusion at the C6-7 level. This non-union of bone in the Plaintiff's neck is a condition known as pseudoarthrosis.

Apparently, the Plaintiff's pseudoarthrosis may have been caused in part by his decision to keep smoking despite his doctor's instructions.  In this regard, when asked whether he believed that the Plaintiff's smoking habit was the reason the Plaintiff developed pseudoarthrosis, Dr. Lefkowitz testified that "[i]t is a contributing factor, I think.  I don't know it is the reason."  (Tr. 279.)

On January 13, 2012, the Plaintiff underwent a second surgery, again performed by Dr. Lefkowitz.  The procedure, called a posterior spinal fusion, was designed to stabilize the Plaintiff's spine by increasing immobilization.  It was also intended to promote bone grown in the front and back of the Plaintiff's spine.  During the surgery, metal screws were placed in the Plaintiff's bone at the C6 and C7 levels, on both sides of the vertebra, and then connecting rods were inserted on each side while fusion materials were inserted into the disc space.  After the operation, the Plaintiff received a bone stimulator to foster bone healing.  He continued to complain of neck pain and he took Advil, Aleve and Percocet in order to alleviate his symptoms.

In March of 2012, the Plaintiff visited Dr. Lefkowitz and complained of suffering occasional neck pain during lengthy car rides.  Dr. Lefkowitz testified that two months later, by May of 2012, the Plaintiff was doing well and only occasionally experienced neck pain.  The Plaintiff's neck had a full range of motion, his anterior and posterior incisions had healed well and his motor strength, sensation and walking were normal.

In July of 2012, due to the increased intensity of his pain, the Plaintiff ceased attending physical therapy.  Dr. Lefkowitz stated that he did not know what was causing the Plaintiff's elevated pain during physical therapy, but pointed to the fact that plaintiff had two previous surgeries performed on his neck.

Two weeks before the trial, on August 27, 2013, Dr. Lefkowitz examined the Plaintiff and observed weakness in the Plaintiff's left triceps, biceps and intrinsic muscles of the left arm. Dr. Lefkowitz believed the Plaintiff was suffering from a condition called cervical radiculopathy, which involved nerve irritation.

At the time of the trial, the Plaintiff testified that he was in constant pain, continued to experience weakness in his left arm and was limited in the activities he could engage in, including sleeping and driving his car. In addition, Dr. Lefkowitz testified that while the Plaintiff suffered from a pre-existing condition involving disc degeneration, narrowing and osteophyte formation, it was the Plaintiff's central spinal cord syndrome injury stemming from the January 12, 2011 accident which was the reason for the Plaintiff's pain and symptoms. Further, according to Dr. Lefkowitz, the Plaintiff's two operations were necessary because of the injury caused by January 12, 2011 accident. Concerning the Plaintiff's future pain and suffering as a result of his injuries, Dr. Lefkowitz indicated that he was still evaluating the Plaintiff's symptoms, but that he believed the Plaintiff's neck pain would likely continue and that he would never be able to return to his previous position of employment with the Defendant.

In rendering a verdict in favor of the Plaintiff, the jury determined that the Defendant was negligent with regard to the January 12, 2011 incident, thereby causing the Plaintiff's injuries outlined above. Accordingly, as previously stated, the jury awarded the Plaintiff $450,000 for past pain and suffering and $700,000 for future pain and suffering.

## II. DISCUSSION

### A. Legal Standards

#### 1. Legal Standard Under Fed. R. Civ. P. 50(b)

In substance, Fed. R. Civ. P. 50(b) provides that if a jury returns a verdict for which there

is not a legally sufficient evidentiary basis, the district court may either order a new trial or direct

the entry of judgment as a matter of law.  In order to grant a motion pursuant to Fed. R. Civ. P.

50(b), there must be a "'complete absence of evidence supporting the verdict that the jury's

findings could only have been the result of sheer surmise and conjecture, or . . . such an

overwhelming amount of evidence in favor of the movant that reasonable and fair minded men

[and women] could not arrive at a verdict against [it].'"  Lavin-Mceleney v. Marist College, 239

F.3d 476, 480 (2d Cir. 2001) (quoting DiSanto v. McGraw-Hill, Inc., 220 F.3d 61, 64 (2d Cir.

2000)); see also Concerned Area Residents for Environment v. Southview Farm, 34 F.3d 114,

117 (2d Cir. 1994); Song v. Ives Lab., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992); Mattivi v. South

African Marine Corp. "Huguenot", 618 F.2d 163, 168 (2d Cir. 1980).

"The same standard that applies to a pre-trial motion for summary judgment pursuant to

Fed. R. Civ. P. 56 also applies to motions for judgment as a matter of law during or after trial

pursuant to Rule 50." Piesco v. Koch, 12 F.3d 332, 341 (2d Cir. 1993); see also the Advisory

Committee Note to the 1991 Amendment of Fed. R. Civ. P. 50.  This Rule is well and clearly

explained in the seminal case of This Is Me, Inc. v. Elizabeth Taylor, 157 F.3d 139 (2d Cir.

1998).  In Taylor, the Court commented that the then recent adoption of the term "judgment as a

matter of law" to replace both the term "directed verdict" and the term "judgment N.O.V." was

intended to call attention to the close relationship between Rule 50 and 56.  157 F.3d at 142.  The

Court then went on to explain the basis for granting a post-verdict Rule 50 motion, as follows:

> A district court may not grant a motion for a judgment as a matter
> of law unless "the evidence is such that, without weighing the
> credibility of the witnesses or otherwise considering the weight of
> the evidence, there can be but one conclusion as to the verdict that
> reasonable [persons] could have reached." Cruz v. Local Union
> No. 3, Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154–55 (2d Cir.
> 1994) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970))
> (internal quotation marks omitted).  Weakness of the evidence does

not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that "a reasonable juror would have been compelled to accept the view of the moving party." Piesco, 12 F.3d at 343.

Id.; see also Fabri v. United Techs. Int'l Inc., 387 F.3d 109, 119 (2d Cir. 2004) (same); Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).

When ruling on a Fed. R. Civ. P. 50(b) motion, a court must "'consider the evidence in the light most favorable to the [non-moving party] and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence.'" Concerned Residents for the Env't v. Southview Farm, 34 F.3d 114, 117 (2d Cir. 1994), cert. denied, 514 U.S. 1082, 115 S. Ct. 1793, 131 L. Ed. 2d 721 (1995), (quoting Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir. 1988)). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151, 120 S. Ct. 2097 (2000); Meloff v. New York Life Ins. Co., 240 F.3d 138, 145 (2d Cir. 2001). Accordingly, when ruling on a motion brought pursuant to Rule 50, the court may not rule on the credibility of the witnesses or the weight of the evidence. Caruso v. Forslund, 47 F.3d 27, 32 (2d Cir. 1995). Rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury. See Williams v. Cnty. of Westchester, 171 F.3d 98, 101 (2d Cir. 1999).

A Fed. R. Civ. P. 50(b) motion is thus "proper only if 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" Fiacco v. City of Rensselaer, 783 F.2d 319, 329 (2d Cir. 1986) (quoting Simblest, 427 F.2d at 4). Such motions "should be granted cautiously and sparingly." 9A Charles A. Wright & Arthur R.

Miller, Federal Practice and Procedure § 2524, at 252 (1995); <u>Japan Airlines Co. Ltd. v. Port Auth. of New York & New Jersey</u>, 178 F.3d 103, 112 (2d Cir. 1999).

### 2. Legal Standard Under Fed. R. Civ. P. 59

Under Fed. R. Civ. P. 59, a court "may, on motion, grant a new trial on all or some of the issues — and to any party — . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "'A motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'" <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 133 (2d Cir. 1998) (quoting <u>Song v. Ives Labor, Inc.</u>, 957 F.2d 1041, 1047 (2d Cir. 1992)). The general grounds for a new trial are that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive. 12 Moore's Federal Practice, § 59.13[1] at 59-43 (3d Ed. 2005).

In comparison to a Rule 50 motion, the Second Circuit has held that the standard for a Rule 59 motion in some respects is less onerous for the moving party in two ways: first, "[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." <u>DLC Mgmt. Corp</u>, 163 F.3d at 134. Second, in deciding a Rule 59 motion "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." <u>Id.</u> However, the granting of a new trial is an extraordinary relief, and one that "is properly granted only upon a showing of exceptional circumstances." <u>Id.</u> at 391.

9

**B. As to the Defendant's Motion**

In this case, the Defendant argues for a new trial on the issue of the damage awards for past and future pain and suffering or, in the alternative, for remittitur of those awards. In this regard, the Defendant contends that the awards for past and future pain and suffering are excessive.

"A verdict is so high as to be excessive only if it surpasses an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable persons may differ, but a question of law." Ahlf v. CSX Transp., Inc., 386 F. Supp. 2d 83, 87 (N.D.N.Y. 2005) (quoting Mazyck v. Long Island R.R. Co., 896 F. Supp. 1330, 1336 (E.D.N.Y. 1995)) (internal ellipse omitted). "If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." Id. (quoting Casey v. Long Island R.R. Co., No. 01 Civ. 9751(RCC), 2004 WL 1609330, at *4, (S.D.N.Y. July 16, 2004) (in turn, citing Tingley Sys., Inc. v. Norse Sys., Inc., 49 F.3d 93, 96 (2d Cir. 1995))).

With respect to damages awarded for pain and suffering, "[b]ecause there is no precise way in which to calculate [such] damages . . . , the jury's award should not be disturbed unless 'the quantum of damages found by a jury is clearly outside the maximum limit of a reasonable range.'" Id. (quoting Paper Corp. v. Schoeller Technical Papers, Inc. 807 F. Supp. 337, 350 (S.D.N.Y. 1992). Further, a court is required to "[v]iew[ ] the evidence pertaining to pain and suffering in the light most favorable to the plaintiff," Mazyck, 896 F. Supp. at 1336, as well as consider the jury award based on "the particular facts of [the] case." Ahlf, 386 F. Supp. 2d at 87. With that said, "[i]n order to determine whether a particular award is excessive, courts have

10

[nevertheless] found it useful to review awards in other cases involving similar injuries." <u>Nairn v. Nat'l R.R. Passenger Corp.</u>, 837 F.2d 565, 568 (2d Cir. 1988)

In this case, the Plaintiff brought his lawsuit pursuant to the FELA. Under the terms of the FELA,

> [e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in commerce . . . for such injury . . . resulting in whole or in part from the negligence of any officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. "FELA is liberally construed, and its language regarding causation is as broad as could be framed." <u>Pitter v. Metro-N. Commuter R.R.</u>, 826 F. Supp. 2d 612, 615 (S.D.N.Y. 2011) (citing <u>CSX Transp., Inc. v. McBride</u>, 131 S. Ct. 2630, 2636, 180 L. Ed. 2d 637 (2011); <u>Consol. Rail Corp. v. Gottshall</u>, 512 U.S. 532, 543, 114 S. Ct. 2396, 129 L. Ed. 2d 427 (1994)) (internal quotation marks omitted).

Accordingly, "the United States Supreme Court has interpreted FELA as prescribing a relaxed standard of causation that departs from the ordinary proximate cause requirement of common law negligence." <u>Id.</u> (citations and internal quotation marks omitted); <u>see also</u> <u>Corsale v. Delaware & Hudson Ry. Co.</u>, 1:08-CV-572 GLS/RFT, 2010 WL 3907827, at \*3 (N.D.N.Y. Sept. 30, 2010) (recognizing that in an FELA case, "[t]he traditional concept of proximate cause is supplanted by the less stringent standard that there be some causal relation, no matter how slight, between the injury and the railroad's breach of duty.") (quoting <u>Marchica v. Long Island R.R. Co.</u>, 31 F.3d 1197, 1207 (2d Cir. 1994)) (internal brackets omitted).

Of relevance here, "[c]ausation is satisfied under FELA litigation if 'negligence of the employer played any part, even the slightest, in producing the injury or death for which damages

11

are sought.'" Pitter, 826 F. Supp. 2d at 615 (citing Rogers v. Mo. Pac. R.R. Co., 352 U.S. 500, 509, 77 S. Ct. 443, 1 L. Ed. 2d 493 (1957)); see also Corsale, 2010 WL 3907827 at * 3 ("In evaluating causation, the question is 'whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury for which damages are sought.'") (quoting Rogers v. Mo. Pac. R.R. Co., 352 U.S. 500, 506, 77 S. Ct. 443, 1 L. Ed. 2d 493 (1957)) (internal brackets and ellipse omitted). As a result, "railroad employees injured by employer negligence [may] collect damages for consequential injuries, including those that might appear to be too attenuated under common law." Pitter, 825 F. Supp. 2d at 615.

Given the evidence presented at the trial, the Court is not persuaded by the Defendant's contention that the damages awards for both past and future pain and suffering were excessive. In this regard, the testimony of the Plaintiff and of his treating physician, Dr. Lefkowitz, which the jury credited, established that (1) immediately following the January 12, 2011 accident, the Plaintiff experienced pain in his head, neck and back requiring an emergency room visit; (2) the Plaintiff was diagnosed with a central spinal cord syndrome injury, which was the result of the January 12, 2011 incident; (3) the Plaintiff's central spinal cord syndrome injury caused weakness and sensory changes in his upper extremities, especially as to the use of his hands and walking; (4) the Plaintiff's injury required him to undergo two spine surgeries which involved the removal of discs and ligaments and the insertion of metal screws, a metal plate, bone implants, connecting rods and fusion materials; (5) the Plaintiff continued to experience weakness in his left arm and significant pain from the bottom of his head through his neck and upper back as a result of his injury and the related surgeries; (6) although he was feeling better in September of 2011 and attempted to return to work, the performance of his job intensified his pain so that he had to leave his employment by October of 2011; and (7) based on his treatment

12

of the Plaintiff, Dr. Lefkowitz believed that the Plaintiff's ongoing neck pain would continue and would prevent the Plaintiff from ever returning to his employment with the Defendant.

Instructive here is the district court's decision in Ahlf v. CSX Transp., Inc., 386 F. Supp. 2d at 85–86, which denied the defendant's motion for a new trial or, in the alternative, remittitur, where the jury awarded the plaintiff, in relevant part, $1,000,000 for past pain and suffering and $750,000 for future pain and suffering. The Ahlf defendant asserted, among other arguments, that the jury verdict was excessive as matter of law. Id. at 85.

In Ahlf, "while working as an engineer for [the] [d]efendant, [the] [p]laintiff was injured when the train on which he was working was working was struck by another train." Similar to the Plaintiff in the instant action, the Ahlf plaintiff went to the emergency room complaining of shoulder and back pain. Id. Moreover, he continued to suffer from pain in his lower back and ultimately underwent a spinal fusion procedure, as the Plaintiff did here. Id. at 85–86. The Ahlf plaintiff also attempted to return to work with the defendant, but within approximately three months, he "was forced to stop working because of significant pain in his lower back." Id. at 86. Eventually, the Ahlf plaintiff decided to return to college and obtained his teaching certification, but he struggled to find a full-time teaching position. Id.

Although the defendant in Ahlf attempted to demonstrate that the $1,750,000 award for pain and suffering was excessive by citing to a number of "cases in which plaintiffs were awarded lesser amounts for injuries which [the] [d]efendant argue[d] [were] comparable to, or arguably worse than, those in [the] [Ahlf] case," the court explained that "[those] cases [were] not dispositive of what constitutes a reasonably jury award for past and future pain and suffering for [the] [p]laintiff's injuries," as "none of [those] courts held that the jury's verdict was the a maximum amount allowable for the plaintiff's pain and suffering." Id. at 89.

13

In this regard, the Ahlf court pointed to the case Bean v. CSX Trans., Inc., 289 F. Supp. 2d 277 (N.D.N.Y. 2003), "where the court upheld a $1,100,000 award for pain and suffering to an injured railroad employee who had a similar spinal fusion surgery . . . and continued 'to experience pain, likely faces further surgery in the next two years to remove an additional disc, and he is totally disabled from future employment.'" Id. at 89 (quoting Bean, 289 F. Supp. 2d at 284). In Bean, the court explained that "[a] survey of similar cases reveals that awards for pain and suffering for severe back injuries as high as $3,000,000 have been sustained in federal and state courts under both the 'shock the conscience' standard or under the less deferential state law standard.'" Bean, 289 F. Supp. 2d at 285 (collecting cases).

The Ahlf court also distinguished the case of Casey v. Long Island R.R. Co., 2004 WL 1609330 at *1–2. Ahlf, 386 F. Supp. 2d at 90. The plaintiff in Casey "sustained a herniated disk and underwent surgery placing four screws and two rods in his back." Id. (citing Casey, 2004 WL 1609330 at *1–2.) While the Casey court upheld the jury's award of $350,000 for the plaintiff's past pain and suffering, it declined to uphold the $1,300,000 award for the plaintiff's future pain and suffering. Casey, 2004 WL 1609330 at *6. The Casey court reasoned that the latter award was excessive because the plaintiff's pain had decreased significantly since his surgery and he reported no longer feeling pain due to his back injury. Id. at *5–6. Conversely, in Ahlf, as is in this case, "the evidence suggests that even after surgery, [the plaintiff] suffered from significant aggravation and pain, to the point which he was forced to stop working for [the] [d]efendant[.]" Ahlf, 386, F. Supp. 2d at 90. As a result, based on similar cases, the Ahlf court held that "the jury's award of $1,000,000 for five years of past pain and suffering and $750,000 for thirty years of future pain and suffering for a severe back injury and major surgery falls within the reasonable range of verdicts." Id.

14

This Court finds that the reasoning employed by the court in <u>Ahlf</u> is more than applicable to the present action.  Like <u>Ahlf</u>, the Plaintiff has suffered a severe back injury requiring surgeries involving the removal of discs and ligaments and the insertion of metal screws, a metal plate, bone implants, connecting rods and fusion materials and causing substantial and continuing pain.  At the time of trial, the Plaintiff was forty-nine years old and had been experiencing pain and suffering for approximately two years and eight months.  Thus, the Plaintiff was awarded $450,000 for his nearly three years of past pain and suffering, which about half the award the <u>Ahlf</u> plaintiff received for five years of pain and suffering, and $700,000 for his estimated thirty years of future pain and suffering, which is comparable to the $750,000 awarded to the <u>Ahlf</u> plaintiff.  <u>See</u> National Vital Statistics Reports, United States Life Tables, 2009, Vol. 62, No. 7, Table a, published January 6, 2014, available at http://www.cdc.gov/nchs/ data/nvsr/nvsr62/nvsr62_07.pdf (noting that a male living in the United States who reaches the age of fifty years old has, on average, 29.4 years of life remaining).

 The Court sees no reason to disturb the jury's verdict.  <u>See also</u> <u>Marasa v. Atlantic Sounding Co., Inc.</u>, 557 F. App'x 14, 20 (finding no clear error in the district court's award of $500,000 for past suffering and damages and $700,000 for future pain and suffering where the plaintiff's "injury resulted in extraordinary pain and suffering, requiring multiple surgeries and aily medication"); <u>Bean</u>, 289 F. Supp. 2d at 283 (upholding a jury award of $300,000 for approximately three years of past pain and suffering and $800,000 for twenty-eight years of future pain and suffering where the plaintiff suffered a serious back injury and required surgery).

To the extent the defendant contends that the jury verdict is excessive because the plaintiff had a pre-existing injury, the Court finds its argument unavailing.  "[The] Defendant has the burden of proving that [the] Plaintiff had a pre-existing condition[,]. . . [and] if the jury was

unable to separate the pain and disability caused by the pre-existing condition, then the jury should be instructed to hold [the] Defendant liable for all of [the] Plaintiff's injuries." Ahlf, 386 F. Supp. 2d at 91. In this case, although Dr. Lefkowitz acknowledged that the Plaintiff had a pre-existing condition related to his spine, he testified that the Plaintiff's pain and suffering was due to the central spinal cord syndrome injury he suffered as a result of the January 12, 2011 accident. He further testified that the surgeries that the Plaintiff underwent were necessitated by his injury from the January 12, 2011 occurence. In the Court's view, it would not be unreasonable for the jury to credit the explanation of the Plaintiff's treating physician concerning the underlying reason for the Plaintiff's symptoms. Accordingly, "the jury's verdict is within the realm of reasonableness and does not approach the threshold of being the sort of 'seriously erroneous result' that would constitute a miscarriage of justice and necessitate a new trial." Id. at 91.

In similar fashion, the fact that Dr. Lefkowitz testified that the Plaintiff's smoking habit could have possibly contributed in part to his development of pseudoarthrosis does not mean that the jury's verdict was excessive as to the damages for the Plaintiff's pain and suffering. This is because a reasonable jury could have found that even if the Plaintiff's smoking habit possibly contributed to his pseudoarthrosis, the January 11, 2012 was nonetheless the catalyst and root cause of his neck and back injury, the related pain and suffering and the surgeries. Indeed, Dr. Lefkowitz's testimony did not offer a definitive statement that the Plaintiff's smoking was the reason that the Plaintiff developed pseudoarthrosis, nor did he suggest that all of the Plaintiff's pain and suffering was caused by his pseudoarthrosis. Rather, Dr. Lefkowitz stated that the Plaintiff's symptoms were the result of his January 12, 2011 injury and that it was this injury that caused him to have to undergo two operations, resulting in additional pain and suffering.

In sum, the Court finds that the damages awards for the Plaintiff's past and future pain and suffering were not excessive.  Thus, the Court denies the Defendant's motion and upholds the jury's verdict.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Defendant's motion pursuant to Fed. R. Civ. P. 50(b) and 59 is denied.

**SO ORDERED.**

Dated: Central Islip, New York
September 16, 2014

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge